Thomas Wheeler (SBN 308789)
**TOM WHEELER LAW**
213 North Glendale Ave. #1188
Glendale, CA 91206
T: (213) 342-4243
tom@twheelerlaw.com

Zachary Arbitman**
George Donnelly**
**FELDMAN SHEPHERD**
**WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com

*Attorneys for Plaintiff and the Putative Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| KRISTIN ELLSWORTH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HATCH BABY, INC.,<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Kristin Ellsworth ("Plaintiff"), individually and on behalf of all others similarly situated ("Class" or "Classes"), hereby brings this Class Action Complaint against Defendant Hatch Baby, Inc. ("Hatch" or "Defendant"). Plaintiff makes the following allegations upon information and belief and investigation by her counsel, except for allegations related to her personal purchase and use of her Infant Sound Machine, which are based on personal knowledge.

## INTRODUCTION

1. Defendant manufactures, markets, and sells sound machines for children, including, but not limited to, the Rest Go (now sold as the "Hatch Go") and other substantially similar products ("Infant Sound Machines").[1]

2. Hatch lures consumers with children who are desperate for improved sleep to purchase its Infant Sound Machines by focusing on their ability to deliver "better sleep,"[2] while entirely omitting the material fact that its Infant Sound Machines do not meet scientific, medical or industry guidance, and regulatory standards for infant auditory exposure limits. The scientific, medical, industry, and regulatory communities have concluded that children's exposure to white noise—such as that emitted from Hatch's Infant Sound Machines—presents a hearing loss risk when used at too high of a volume, when located too close to the child's ears, and when used for too long of a period of time (the "Hearing Loss Risk"). Despite the well-documented Hearing Loss Risk associated with the use of white noise machines, Hatch's Infant Sound Machines exceed the threshold decibel limit and inappropriately promote usage of the Infant Sound Machines in close proximity to children's ears.

3. Hatch is well aware of the Hearing Loss Risk posed by Infant Sound Machines, yet it continues to market and advertise its Infant Sound Machines without disclosing the Hearing Loss Risk. Hatch has concealed the Hearing Loss Risk in order to maintain sales and profits and continue to sell its Infant Sound Machines.

4. Worse still, Defendant's pervasive marketing and advertising campaign encourages

---

[1] Plaintiff reserves the right to include additional Infant Sound Machine products upon completion of fact discovery.

[2] https://www.hatch.co/ (last accessed Oct. 16, 2026).

dangerous uses that heighten the Hearing Loss Risk, while failing to warn of that Risk. Though the exact amount Defendant has profited from the sale of these dangerous Infant Sound Machines will be identified through discovery, upon information and belief, that number is in the tens of millions.[3]

5. Hatch's material omissions mislead a reasonable consumer as no reasonable consumer would purchase, or pay the amount they paid, for the Infant Sound Machines if they knew the Infant Sound Machines pose the Hearing Loss Risk to their children. Thus, by purchasing one of Defendant's Infant Sound Machines, Plaintiff and each Member of the Class were injured by Defendant's conduct because they paid more for an Infant Sound Machine they would not have purchased or would have paid less for had they known the Hearing Loss Risk posed to their children.

6. Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased Hatch's Infant Sound Machines to halt the dissemination of this false, misleading and deceptive advertising, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Infant Sound Machines.

## PARTIES

### I. Plaintiff Kristin Ellsworth

7. Plaintiff Kristin Ellsworth is a citizen of California and currently resides in Irvine, California. Plaintiff Ellsworth purchased a Hatch Rest Go Infant Sound Machine from Amazon.com on November 24, 2023, for approximately $34.99.

### II. Defendant Hatch Baby, Inc.

8. Defendant Hatch Baby, Inc. is a Delaware corporation headquartered at 3790 El Camino Real, Unit 627, Palo Alto, California 94306. Upon information and belief, Hatch's relevant business decision making, including its marketing for the Infant Sound Machine, originated and continues to originate out of its California headquarters and/or its presence in California.

[3] *See*, *e.g.*, https://www.youtube.com/watch?v=HTcXBzgII5Q (last accessed Oct. 16, 2026) (claiming Hatch had $40 million in sales following the founders' appearance on the TV show "Shark Tank").

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because there are 100 or more class members; at least one class member is a citizen of a state that is diverse from Defendant's citizenship; and the matter in controversy exceeds $5 million, exclusive of interest and costs.

10. This Court has personal jurisdiction over Defendant because Defendant operates, conducts and engages in substantial business in this judicial district, including, but not limited to, the promotion, sale, marketing and distribution of its Infant Sound Machines; Defendant committed tortious acts in this State through its misrepresentations and omissions related to the sale, marketing and distribution of the Infant Sound Machines; Defendant caused injury to persons within this State; and a substantial portion of the actions giving rise to the claims took place in this State, given Defendant is headquartered in Palo Alto, California.

11. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events, misrepresentations and omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. This is especially true given Defendant is headquartered in Palo Alto, California.

## DIVISIONAL ASSIGNMENT

12. Pursuant to Local Rule 3-2(c) and (e), this action may be assigned to the San Jose Division, as a substantial part of the events or omissions giving rise to the claim occurred in this Division.

## FACTUAL ALLEGATIONS

**I. The Hatch Infant Sound Machines**

13. Defendant is among the leading designers, manufacturers and distributors of sound machines, including the Infant Sound Machines. The following is an illustrative example of Defendant's Rest Go:



14. Defendant now markets this product as the Hatch Go which, upon information and belief, is substantially similar, if not identical, to the Rest Go product purchased by Plaintiff:


[4]

15. Defendant's Infant Sound Machines are sold on Hatch.co in the United States and Canada, through most major third-party retailers, and internationally via Amazon.[5] The Hatch Go

---

[4]https://www.hatch.co/go?srsltid=AU7gw4X1x0ig_0HDPDkZoEjAP_i85zoxBbmdba3zQqZEv3TwVNhFZElq (last accessed Oct. 16, 2026).

[5] https://help.hatch.co/hc/en-us/articles/40645302452887-Where-can-I-purchase-Hatch-Go (last accessed Oct. 16, 2026)

sells at retail for $39.99.[6]

## II. The Hearing Loss Risk Presented by Hatch's Infant Sound Machines

16. The Infant Sound Machines present a risk of noise-induced hearing loss due to cumulative and prolonged exposure to excessive auditory stimulation.[7] Specifically, WHO notes that children are not simply little adults, but that their developing physiology and psychology makes them vulnerable to exposures that may be less consequential for adults.[8] In fact, many studies have shown that noise exposure at an early age may contribute to an increased level of hearing loss later in life even after the exposure to noise has ceased.[9] Noise-induced hearing loss is permanent and sensorineural damage is entirely irreversible.[10] Despite the consensus that excessive exposure to auditory stimulation can cause and increase the risk of noise-induced hearing loss in children,[11] Hatch wholly fails to inform or warn consumers of the Hearing Loss Risks associated with the use of its Infant Sound Machines.[12]

---

[6] https://www.hatch.co/go (last accessed Oct. 16, 2026).

[7] Make listening safe: World Health Organization. Noise exposure limit for children in recreational settings: review of available evidence. https://cdn.who.int/media/docs/default-source/documents/health-topics/deafness-and-hearing-loss/monograph-on-noise-exposure-limit-for-children-in-recreational-settings.pdf (last accessed Oct. 16, 2026); Balk SJ, Bochner RE, Ramdhanie MA, Reilly BK. Preventing excessive noise exposure in infants, children, and adolescents. Policy Statement: Organizational principles to guide and define the child health care system and/or improve the health of all children. American Academy of Pediatrics. Pediatr 2023;152(5):e2023063752; *see also* Russell W. De Jong, et al. Continuous white noise exposure during sleep and childhood development: A scoping review. Sleep Medicine 2024; 119:88-94. https://doi.org/10.1016/j.sleep.2024.04.006.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Hatch's Infant Sound Machines pose additional material risks, which Hatch similarly fails to inform or warn consumers:

**(A)** Excessive exposure to auditory stimulation can cause and increase the risk of sleep disturbance and arousal in children. *See* Gadeke R, Doring B, Keller F, Vogel A. The noise level in a children's hospital and wake-up thresholds in infants. Acta Pediatr Scand 1969;58:164-170; Miller CL, Byrne JM. Psychophysiologic and behavioural response to auditory stimuli in the newborn. Infant Behav Dev 1983;6(2-3):369-389

17. Unbeknownst to consumers, scientific and medical literature concerning infant sound machines and white noise concludes that using Hatch's Infant Sound Machines, as designed, advertised, and instructed, poses a Hearing Loss Risk to children and that the Infant Sound Machines do not meet scientific, medical and industry guidance, and regulatory standards. This information is material to reasonable consumers when purchasing an infant sound machine.

18. The Committee to Establish Recommended Standards for Newborn ICU Design[13]

---

**(B)** Excessive exposure to auditory stimulation can cause and increase the risk of heart conditions such as tachycardia (increased heart rate), bradycardia (low heart rate), hypotension (decreased blood pressure) and an increased risk of weakened vessel walls in cerebral vasculature in children. See Miller CL, Byrne JM. Psychophysiologic and behavioural response to auditory stimuli in the newborn. Infant Behav Dev 1983;6(2-3):369-389; Field TM, Dempsey JR, Hatch J, Ting G, Clifton RK. Cardiac and behavioural responses to repeated tactile and auditory stimulation by preterm and term neonates. Dev Psychol 1979;15(4):406-416; Philbin MK, Taber KH, Hayman LA. Preliminary report: changes in vital signs of term newborns during MR. AJNR Am J Neuroradiol 1996;17(6):1033-1036; Vranekovic G, Hock E, Isaac P, Cordero L. Heart rate variability and cardiac response to an auditory stimulus. Biol Neonate 1974;24(1):66-73; Anderssen SH, Nicolaisen RB, Gabrielsen GW. Autonomic response to auditory stimulation. Acta Paediatr 1993;82(11):913-918; Morin FC, Weiss KI. Response of the fetal circulation to stress. In: Polin RA, Fox WW, eds. Fetal and Neonatal Physiology. Philadelphia: WB Saunders;1992. P. 620-629.

**(C)** Excessive exposure to auditory stimulation can cause and increase the risk of cessation in breathing and a decrease in oxygen saturation in children. See Anderssen SH, Nicolaisen RB, Gabrielsen GW. Autonomic response to auditory stimulation. Acta Paediatr 1993;82(11):913-918; Philbin MK, Taber KH, Hayman LA. Preliminary report: changes in vital signs of term newborns during MR. AJNR Am J Neuroradiol 1996;17(6):1033-1036.

**(D)** Excessive exposure to auditory stimulation can cause and increase the risk of noise-induced hearing loss in children. See Make listening safe: World Health Organization. Noise exposure limit for children in recreational settings: review of available evidence. https://cdn.who.int/media/docs/default-source/documents/health-topics/deafness-and-hearing-loss/monograph-on-noise-exposure-limit-for-children-in-recreational-settings.pdf. (Last accessed Oct. 16, 2026); Balk SJ, Bochner RE, Ramdhanie MA, Reilly BK. Preventing excessive noise exposure in infants, children, and adolescents. Policy Statement: Organizational principles to guide and define the child health care system and/or improve the health of all children. American Academy of Pediatrics. Pediatr 2023;152(5):e2023063752.

**(E)** Excessive exposure to auditory stimulation can cause and increase the risk of decrease in speech and language comprehension, communication, classroom learning and social development. *See id*.

[13] Inspired by the March of Dimes report, *Toward Improving the Outcomes of Pregnancy*, several organizations formulated developmental care and hospital design guidelines. In 1993, an open, multi-disciplinary conference on NICU design and care led to the creation of a multi-disciplinary committee of neonatologist, nurses, researchers, architects, and regulators. They convened to review

has adopted the standards developed by the Sound Study Group of the National Resource Center: The Physical and Developmental Environment of the High-Risk Infant. This standard requires that continuous sound in any occupied bed space or patient care area shall not exceed: (1) an hourly $L_{eq}$[14] of 50 dBA[15] and (2) an hourly $L_{10}$ of 55 dBA. The 1-second $L_{max}$ shall not exceed 70 dBA.[16] A subsequent consensus statement on Recommended Standards for Newborn ICU design states that

---

current evidence on the physical environment of the NICU and this led to the *First Recommended Standards of Newborn Intensive Care Unit Design*. The Consensus Committee has continued to meet and update the recommended standards and this is the 9th edition.

The multi-disciplinary conference continued and became the *Gravens Conference on the Environment of Care of the High-Risk Newborn*. Out of this meeting, there was a call to develop a multi-disciplinary consensus on developmentally supportive care practices, in addition to the physical design recommendations.

The Consensus Committee was assembled with nursing, neonatology, physical and occupational therapy, psychology, social work, speech-language, and parent support professionals. *See* https://nicudesign.nd.edu/ (last accessed Oct. 16, 2026).

[14] **$L_{eq}$** is a measurement of equivalent continuous sound level. This measurement is used due to the reality that actual noise fluctuates in sound waves. As a result, this measurement reflects the steady sound pressure level that has the same total energy as the actual fluctuating noise.

**Hourly $L_{eq}$** is intended to preserve sleep for most healthy term infants most of the time. For example, an Hourly $L_{10}$ of 55 dBA ensures that sound levels may exceed 55 dBA only 10% of the time, or 6 minutes every hour. *See* Gadeke R, Doring B, Keller F, Vogel A. Noise levels in a children's hospital and wake-up thresholds in infants. Acta Pediatr Scand 1969; 58:164-170.

**$L_{ex}$** is the equivalent continuous average noise level in dBA normalized to an 8-hour exposure.

**$L_{max}$** is the maximum 1-second duration of a sound. Continuous sounds can cause injury at lower intensities, whereas a short brief sound usually needs a higher intensity to cause injury.

[15] **Decibel scale (dB)** refers to the intensity of a sound as it is produced by a device. However, this does not consider how the human ear responds to that sound. For example, the sound must travel through the ear canal (the shape of which varies across people and with age), vibrate the ear drum, move the ossicles of the middle ear, and vibrate the cochlea (inner ear) to create waves of fluid that will stimulate nerve endings in the auditory nerve. Loud noise can also shake the skull directly, and most human skulls vibrate at a resonant frequency of 4000 Hz. That is why loud noises of any frequency usually cause a hearing loss at 4000 Hz.

**A-weighted decibels (dBA)** are used to account for the impact of dB on the human ear and the potential for damage to hearing and to describe the intensity of the sound and how the human ear responds to it.

[16] Philbin MK, Robertson A, Hall 3rd JW. Recommended permissible noise criteria for occupied newly constructed or renovated hospital nurseries. The Sound Study Group of the National Resource Center. J Perinatol 1999;19(8Pt1):559-563.

infant rooms shall be designed to mitigate a combination of background sound and operational sound of at least $L_{50}$ of 45 dBA-weighted, slow response and an $L_{10}$ of 65 dBA-weighted, slow response, as measured three feet from any infant bed or other relevant listener position.[17]

19. The American Academy of Pediatrics[18] adopted the Recommended Standards for Newborn Intensive Care Unit Design, 9th Edition wherein sound exposure for newborns should be "[m]itigate[d] [with] a combination of continuous background sound and operational sound of at least $L_{50}$ of 45 dBA-weighted, slow response and an $L_{10}$ of 65 dBA-weighted, slow response, as measured three feet from any infant bed or other relevant listener position."[19]

20. When reviewing the applicable scientific, medical, industry, and regulatory communities' standards and recommendations for child noise exposure as a whole, children should not be exposed to any white noise due to the risk of noise-induced hearing loss from cumulative and prolonged exposure to excessive auditory stimulation.[20]

---

[17] Altimier L, Barton SA, Bender J, et al. Recommended standards for newborn ICU design. J Perinatol 2023;43(Suppl 1):2-16

[18] The American Academy of Pediatrics is dedicated to the principle of a meaningful and healthy life for every child. As an organization of 67,000 physicians who care for infants, children, adolescents, and young adults, the Academy seeks to promote this goal by encouraging and assisting its members in their efforts to meet the overall health needs of children and youth; by providing support and counsel to others concerned with the wellbeing of children, their growth and development; and by serving as an advocate for children and their families within the community at large. https://downloads.aap.org/AAP/PDF/Const-and-Bylaws-2020.pdf (last accessed Oct. 26, 2026).

[19] *See* Standard 29: Acoustic Environment. Recommended standards for newborn ICU design, 9th Ed. https://nicudesign.nd.edu/nicu-standards/standard-29-acoustic-environment/. (Last Accessed Oct. 26, 2026); *see also* Balk SJ, Bochner RE, Ramdhanie MA, Reilly BK. Preventing excessive noise exposure in infants, children, and adolescents. Policy Statement: Organizational principles to guide and define the child health care system and/or improve the health of all children. American Academy of Pediatrics. Pediatr 2023;152(5):e2023063753. TECHNICAL REPORT.

[20] Make listening safe: World Health Organization. Noise exposure limit for children in recreational settings: review of available evidence. https://cdn.who.int/media/docs/default-source/documents/health-topics/deafness-and-hearing-loss/monograph-on-noise-exposure-limit-for-children-in-recreational-settings.pdf (last accessed Oct. 16 2026); Balk SJ, Bochner RE, Ramdhanie MA, Reilly BK. Preventing excessive noise exposure in infants, children, and adolescents. Policy Statement: Organizational principles to guide and define the child health care system and/or improve the health of all children. American Academy of Pediatrics. Pediatr 2023;152(5):e2023063752

21. Hatch's Infant Sound Machines exceed the scientific, medical, industry, and regulatory standards and recommendations for infant auditory exposure, are specifically designed to present a Hearing Loss Risk, and Hatch instructs consumers—through its advertising and marketing campaigns—to use its Infant Sound Machines in a manner which greatly increases the Hearing Loss Risk.[21]

22. Despite the standards set by the scientific, medical, industry and regulatory communities and the Hearing Loss Risk associated with children's use of Infant Sound Machines, Hatch's Infant Sound Machines are specifically and intentionally designed, advertised, and marketed (without disclosing risks) to:

a) exceed the recommendations of the scientific, medical, industry and regulatory communities as to child auditory exposure limit;

b) be used continuously, which exceeds the recommendations of the scientific, medical, industry and regulatory communities; and

c) be used in close-proximity to a child's ears, which is directly opposed to the recommendations of the scientific, medical, industry and regulatory communities.

23. The United States National Institute for Occupational Safety and Health's (NIOSH)[22] standards for noise exposure (85 dBA for 8 hours with a 3 dBA exchange rate)[23] cannot be relied upon when it comes to the Infant Sound Machines. Those standards are limited to workplace exposure for ***adults*** and for the limited goal of limiting exposures in excess risk development of

---

[21] *See* https://www.wsj.com/health/wellness/white-noise-sleeping-tech-science-35701869?mod=hp_listc_pos2 (last accessed Oct. 16, 2026)

[22] The National Institute for Occupational Safety and Health (NIOSH) is the federal institute responsible for conducting research and making recommendations for the prevention of work-related injury and illness. NIOSH is part of the Centers for Disease Control and Prevention (CDC), in the Department of Health and Human Services (DHHS). https://www.cdc.gov/niosh/about/index.html (last accessed Oct. 16, 2026).

[23] About occupational hearing loss. CDC/National Institute for Occupational Safety and Health (NIOSH). https://www.cdc.gov/niosh/noise/about/index.html (last accessed Oct. 16, 2026).

noise-induced hearing loss.[24] These standards are explicitly not meant to apply to infants or children.[25] Similarly, the World Health Organization ("WHO")[26] explicitly states that the NIOSH standards "were not designed to consider vulnerable populations such as children."[27]

**III. Hatch knew of the Hearing Loss Risk and did not disclose it to consumers at or before the point of sale**

24. Hatch fails to notify consumers of the Hearing Loss Risk and the recommendations and standards of the scientific, medical, industry and regulatory communities in its marketing and labeling of its Infant Sound Machines.

25. Ironically, Hatch acknowledges the scientific, medical, industry and regulatory guidance and standards for Infant Sound Machines, as well as the Hearing Loss Risk associated with their use in its January 19, 2024 blog post *Safe Sleep Sounds: What Parents Should Know*.[28] The blog post cites to the 2023 warning from the American Academy of Pediatrics[29] regarding noise exposure in children and represents to consumers that unless the sound machine exceeds 85 decibels

---

[24] *See id.*

[25] *See* Balk SJ, Bochner RE, Ramdhanie MA, Reilly BK. Preventing excessive noise exposure in infants, children, and adolescents. Policy Statement: Organizational principles to guide and define the child health care system and/or improve the health of all children. American Academy of Pediatrics. Pediatr 2023;152(5):e2023063752. POLICY STATEMENT.

[26] The World Health Organization ("WHO") is the United Nations agency that connects nations, partners and people to promote health, keep the world safe and serve the vulnerable – so everyone, everywhere can attain the highest level of health. WHO leads global efforts to expand universal health coverage. WHO directs and coordinates the world's response to health emergencies. And WHO promotes healthier lives – from pregnancy care through old age. WHO's Triple Billion targets outline an ambitious plan for the world to achieve good health for all using science-based policies and programs. *See* https://www.who.int/about (last accessed Oct. 16, 2026).

[27] Roberts B, Neitzel RL. Noise exposure limit for children in recreational settings: review of available evidence. J Acoust Soc Am 2019;146(5):3922; *see also* Make listening safe: World Health Organization. Noise exposure limit for children in recreational settings: review of available evidence. https://cdn.who.int/media/docs/default-source/documents/health-topics/deafness-and-hearing-loss/monograph-on-noise-exposure-limit-for-children-in-recreational-settings.pdf (last accessed Oct. 16, 2026).

[28] https://www.hatch.co/blog/sound-machine-safety-baby (last accessed Oct. 16, 2026).

[29] https://www.aap.org/en/news-room/news-releases/aap/2023/american-academy-of-pediatrics-sounds-the-alarm-on-excessive-noise-and-risks-to-childrens-hearing-in-updated-policy-statement/ (last accessed Oct. 16, 2026).

of sound all night, your child is safe![30] Hatch goes one step further and reassures consumers that "the study doesn't mean that sound machines are inherently unsafe."[31]

26. This blog post is wholly insufficient as a warning for consumers regarding the Hearing Loss Risk. Nowhere on the Infant Sound Machines' labeling, packaging or on the product webpages does Hatch disclose the Hearing Loss Risk. To the contrary, Hatch's Infant Sound Machines provide no warning as to the risks of prolonged exposure to high-decibel volumes of white noise.[32]

27. Indeed, despite Hatch's acknowledgment of the scientific, medical, industry and regulatory guidance and standards for Infant Sound Machines in its blog post, the design of the Infant Sound Machines, marketing, and advertising specifically direct consumers to use the Infant Sound Machines in close-proximity to a child's head—thereby increasing the Hearing Loss Risk.

28. Hatch is under a federal duty to evaluate the Infant Sound Machines for these kinds of unreasonable risks. Specifically, federal regulations require "[e]very manufacturer, distributor, and retailer of a consumer product distributed in commerce who obtains information which reasonably supports the conclusion that its product creates an unreasonable risk of serious injury or death is required to notify the [CPSC] immediately." 16 C.F.R. § 1115.6(a) (citing 15 U.S.C. 2064(b)(3)). Hatch is obligated under this regulation to determine whether a product presents an unreasonable risk by examining the "utility of the product, or the utility of the aspect of the product that causes the risk, the level of exposure of consumers to the risk, the nature and severity of the hazard presented, and the likelihood of resulting serious injury or death." 16 C.F.R. § 1115.6(b).

29. By conducting this required analysis of the Infant Sound Machines, Hatch knew, or should have known, that the Infant Sound Machines present the Hearing Loss Risk, and yet took no action to warn consumers of the Hearing Loss Risk. The American Academy of Pediatrics has

---

[30] *Id.*

[31] *Id.*

[32] *See e.g.*, Hugh SC, Wolter NE, Propst EJ, Gordon KA, Cushing SL, Papsin BC. Infant sleep machines and hazardous sound pressure levels. Pediatrics 2014;133(4):677-681; Ghavami Y, Bhatt J, Maducdoc M, Yau A, Mahboubi H, Ziai K, Lin HW, Djalilian HR. Loudness and acoustic parameters of popular children's toys. Int J Pediatr Otorhinolaryngology 2015;79(12):2086-2089.

explicitly classified excessive noise exposure from Infant Sound Machines as a "serious public health hazard."[33]

30. Additionally, the Federal Hazardous Substance Act, codified at 15 U.S.C. §§ 1261, *et seq*. ("FHSA") prohibits the sale of misbranded hazardous substances. *See id*. § 1263. A misbranded hazardous substance is, among other things:

> "[A] hazardous substance (including a toy, or other article intended for use by children, which is a hazardous substance. . . ), intended, or packaged in a form suitable, for use in the household or by children, if the packaging or labeling of such substance is in violation of an applicable regulation . . . or if such substance . . . fails to bear a label—(1) which states conspicuously . . . (D) the signal word 'WARNING' or 'CAUTION' on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as 'Flammable,' 'Combustible,' 'Vapor Harmful,' 'Causes Burns,' 'Absorbed Through Skin,' or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided . . . (G) instruction, when necessary or appropriate, for first-aid treatment; . . . (I) instructions for handling and storage of packages which require special care in handling or storage; and (J) the statement . . . (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard, and (2) on which any statements required under subparagraph (1) of this paragraph are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label."

15 U.S.C. § 1261(p).

31. Accordingly, Defendant had a duty to investigate and disclose all safety hazards regarding the Infant Sound Machines, including the Hearing Loss Risk.

32. As a result of Hatch's omission of the material Hearing Loss Risk, the design of the Hatch Infant Sound Machines and Hatch's below affirmative advertisements and marketing for use of its Infant Sound Machines, and entirely unbeknownst to consumers, through the purchase and use of Hatch's Infant Sound Machines, children are exposed to the Hearing Loss Risk.

## IV. Hatch not only failed to warn of the Hearing Loss Risk, it marketed and advertised its Infant Sound Machines for dangerous uses that heightened that Risk

[33] https://www.aap.org/en/news-room/news-releases/aap/2023/american-academy-of-pediatrics-sounds-the-alarm-on-excessive-noise-and-risks-to-childrens-hearing-in-updated-policy-statement/ (last accessed Oct. 16, 2026).

33. The Hatch Rest Go and Hatch Go are designed to be used "on the go,"[34] which Hatch explicitly advertised as being attached to strollers, cribs, and car seats in close proximity to a child's ears:[35]





[34] https://web.archive.org/web/20250118032251/hatch.co/rest-go (accessed via the WayBack Machine on Oct. 16, 2026).

[35] *Id.*




34. In fact, Hatch encouraged this close proximity usage in its marketing: "My two-year-old likes wearing it as a bracelet […]" and "loud enough to keep [a child] asleep in a crowded restaurant and quiet enough that it didn't impact other guests [adults]."[36]

35. Hatch markets what it now calls the Hatch Go with a "30-Night Bedside Trial" offer, and continues to market the Product as compatible with use very close to an infant's head.[37]

---

[36] *Id.*

[37] Both screenshots below are accessible at https://www.hatch.co/go (last accessed Oct. 16, 2026).


Hatch Go
273 Reviews
10 soothing sounds in one tiny, portable package for sleep on the go.
$39.99
Mint
Add to Cart
Free Shipping & Returns
30-Night Bedside Trial
1-Year Product Warranty




36. Indeed, Hatch hails that "[e]verybody sleeps better with Hatch"[38] and that "[e]xperts believe that infants might find white noise soothing because it mimics sounds they heard while in the womb."[39] Despite these claims, Hatch fails to disclose on the packaging of the Infant Sound Machines that the use of its Infant Sound Machines—as designed, advertised and instructed—pose the Hearing Loss Risk to infants. Instead, Hatch affirmatively advertises the use of the Infant Sound Machines in a manner wholly opposed to the recommendations of the relevant scientific, medical, and regulatory communities.

37. In a blog post from Hatch's website titled "Our Favorite Sleep Sounds for Babies,"[40] Hatch proudly states: "[t]hrough years of research and development, our team of in-house sleep experts have the answer when it comes to the perfect sleep combination for your baby: white noise and red light."[41] In the same blog post, Hatch markets its Infant Sound Machines to parents claiming

[38] https://www.hatch.co/about-us (last accessed Oct. 16, 2026).

[39] https://www.hatch.co/blog/when-will-my-baby-sleep-through-the-night (last accessed Oct. 16, 2026).

[40] https://www.hatch.co/blog/our-favorite-sleep-sounds-for-babies (last accessed Oct. 16, 2026).

[41] *Id.*

"[w]hite noise is great for soothing babies and promoting baby sleep because it's an excellent imitation of the noises they heard in the womb. For this reason, they're used to white noise when they're born,"[42] and "it's important that the white noise is continuous, since it mimics the non-stop internal noises they became acclimated to in the womb."[43]

38. Hatch reassures consumers that it "is no stranger to working closely with experts, as we have been consulting with sleep experts regularly during the product development process to help our users establish healthy and consistent sleep routines," and it "know[s] the deep connection between sleep and overall health."[44]

39. The founders of Hatch, Ann Crady Weiss (CEO) and Dave Weiss, regularly highlight the health benefits of the Hatch product lines, including its Infant Sound Machines. For example, the founders were featured on season 7 of Shark Tank in 2016.[45] Specifically, they highlighted that "insufficient sleep has become a public health epidemic"[46] and a "big issue for children"[47] that their Infant Sound Machines, are specifically "targeted to help."[48] Hatch's marketing of its Infant Sound Machines worked as they generated more than $40 million in sales in the four years following their appearance on Shark Tank.[49]

40. Thus, Hatch has implemented a pervasive and consistent marketing campaign—both on its website and the Infant Sound Machines' labeling—that differentiates its Infant Sound Machines from its competitors, while doubling down on safety, compliance with scientific, medical and industry guidelines and regulatory standards, and systematically omitting that the weight of credible scientific and medical evidence concludes that Infant Sound Machines pose a Hearing Loss

---

[42] *Id.*

[43] *Id.*

[44] https://www.hatch.co/blog/meet-our-hatch-board-of-experts (last accessed Oct. 16, 2026).

[45] https://www.youtube.com/watch?v=HTcXBzgII5Q (last accessed Oct. 16, 2026)

[46] *Id.* at 4:18-4:22.

[47] *Id.* at 4:02-4:06.

[48] *Id.* at 4:15-4:17.

[49] *Id.*

Risk to children.

## V. Plaintiff's Experience

41. Prior to purchasing the Infant Sound Machine, Ms. Ellsworth reviewed Hatch's website and observed no safety warnings on the product label nor any mention of the Hearing Loss Risk to her child through the promoted, normal use of the Infant Sound Machine.

42. Plaintiff Ellsworth utilized the Infant Sound Machine in close proximity to her child as instructed and advertised and believed that attaching the Infant Sound Machine to her child's stroller, crib, car seat, and baby carrier was safe and without the Hearing Loss Risk.

43. Thus, Plaintiff Ellsworth reasonably believed the Infant Sound Machine did not include the Hearing Loss Risk to her child and that the Infant Sound Machine met scientific, medical and industry guidelines, and regulatory standards.

44. Had Plaintiff Ellsworth known that the Infant Sound Machine carried the Hearing Loss Risk through normal use and did not meet scientific, medical or industry guidelines and regulatory standards, she would not have purchased the Infant Sound Machine or would have paid significantly less for it. As such, Plaintiff has been directly financially injured by Defendant's deceptive and misleading advertising.

45. If the Infant Sound Machine carried the appropriate disclosures regarding use per the industry guidelines and regulatory standards, Plaintiff Ellsworth would purchase the Infant Sound Machine.

46. Although Plaintiff Ellsworth regularly shops at retailers that carry the Infant Sound Machine, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Infant Sound Machine in the future. Furthermore, while Plaintiff currently believes the Infant Sound Machine's labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able to determine whether the Infant Sound Machine truly is safe. This leaves doubt in her mind as to the possibility that at some point in the future the Infant Sound Machine could be made in accordance with scientific, medical and industry guidelines, and regulatory standards and the representations on Defendant's website and advertising. This uncertainty, coupled with her

desire to purchase the Infant Sound Machine, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the representations and material omissions. In addition, other Class Members will continue to purchase the Infant Sound Machines, reasonably but incorrectly, believing that they are safe and meet scientific, medical and industry guidelines and regulatory standards.

**VI. Plaintiff Has No Adequate Remedy at Law**

47. Plaintiff seeks restitution if monetary damages are not available. Indeed, restitution under California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL") can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Prod. Co*., 23 Cal. 4th 163, 177 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez v. Wells Fargo Bank, NA*, 589 F. App'x 824, 827 (9th Cir. 2014) (same); *Caro v. Procter & Gamble Co*., 18 Cal. App. 4th 644, 661 (1993) ("In a suit arising under Business and Professions Code section 17200 *et seq*., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

48. But even if damages were available, such relief would not be adequate to address the injuries suffered by Plaintiff and the Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g*., *Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007), *as modified* (Apr. 24, 2007) (noting that restitution is available even in situations where damages may not be available).

49. Plaintiff and the Class seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Defendant's unfair, unlawful and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

**FED. R. CIV. P. 9(b) ALLEGATIONS**
***(Affirmative and By Omission)***

50. Although Defendant is in the best position to know what content it placed on its

marketing materials during the relevant timeframe, and the knowledge that it had regarding the Hearing Loss Risk and its failure to disclose it, as well as the consensus of the scientific, medical, industry and regulatory committees that the Infant Sound Machines present the Hearing Loss Risk, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

51. **Who**: Hatch made the affirmative representations regarding the use of its Infant Sound Machines in opposition to the recommendations and standards of the scientific, medical and industry communities. It also made the material omissions regarding the Hearing Loss Risk and recommendations for use of the Infant Sound Machines by the scientific, medical, industry and regulatory communities. It made these representations and omissions on the Infant Sound Machines' packaging, its website and marketing materials, in written and electronic form.

52. **What**: Hatch's conduct here was, and continues to be, fraudulent because it misrepresented its Infant Sound Machines while omitting and concealing that the Infant Sound Machines pose the Hearing Loss Risk and run afoul of the scientific, medical, industry and regulatory consensus. Hatch's conduct deceived Plaintiff and the Class into believing that the Infant Sound Machines pose no Hearing Loss Risk to children. Hatch knew, or should have known, that this information is material to reasonable consumers, including Plaintiff and the Class, in making their purchasing decisions; yet it omitted and continues to omit any warning that the Infant Sound Machines pose the Hearing Loss Risk to children, as well as information regarding recommendations from the scientific, medical, industry and regulatory communities for use of the Infant Sound Machines. No reasonable consumer would expect that the Infant Sound Machines pose the Hearing Loss Risk to children, or that leading professionals have warned against their use.

53. **When**: Hatch's marketing of the Infant Sound Machines and the material omissions detailed herein were made during the class period, prior to and at the point of sale, leaving Plaintiff and the Class unaware of the Hearing Loss Risk and professional warnings prior to purchasing the Infant Sound Machines.

54. **Where**: Hatch's marketing of the Infant Sound Machines and the material omissions were made on its packaging and marketing materials, on its website and through its social media, in

written and electronic form.

55. **How**: Hatch made misrepresentations and failed to disclose material facts about the Hearing Loss Risk through normal use of the Infant Sound Machines, as well as any information regarding recommendations from the scientific, medical, industry and regulatory communities on proper use of Infant Sound Machines, in written and electronic form on the Infant Sound Machines' packaging and company website.

56. **Why**: Hatch marketed its Infant Sound Machines and the material omissions for the express purpose of inducing Plaintiff and the Class to purchase the Infant Sound Machines, the effect of which was that Hatch profited by selling the Infant Sound Machines to many thousands of consumers.

57. **Injury**: Plaintiff and the Class purchased, or paid more for, the Infant Sound Machines when they otherwise would not have absent Hatch's marketing and material omissions. Further, the scientific, medical, industry and regulatory communities continue to warn about the Hearing Loss Risk associated with the use of Infant Sound Machines. Consumers continue to suffer economic harm by purchasing the Infant Sound Machines that pose the Hearing Loss Risk to their children.

## TOLLING ALLEGATIONS

### I. Discovery Rule

58. The causes of action alleged herein, accrued upon discovery of Defendant's misrepresentations and omissions related to the marketing and advertising of its Infant Sound Machines. Because Defendant concealed them, Plaintiff and Members of the Class did not discover, and could not have known, of the Hearing Loss Risk or material omissions through reasonable and diligent investigation. Reasonable and diligent investigation did not, and could not, reveal a factual basis for a cause of action based on Defendant's misrepresentations, omissions and concealment of the Hearing Loss Risk and recommendations of the scientific, medical, industry and regulatory communities.

### II. Fraudulent Concealment

59. Any applicable statutes of limitation have been tolled by Defendant's knowing,

active and ongoing concealment and denial of the facts as alleged herein.

60. Defendant was, and is, under a continuous duty to disclose to Plaintiff and the Class the true character, quality and nature of the Infant Sound Machines—particularly with respect to the Hearing Loss Risk and recommendations from the scientific, medical, industry and regulatory communities as to the Hearing Loss Risk associated with the use of the Infant Sound Machines.

61. At all relevant times, and continuing to this day, Defendant knowingly, affirmatively and actively misrepresented and concealed the true character, quality, and nature of the Infant Sound Machines and sold the Infant Sound Machines into the stream of commerce with the Hearing Loss Risk and material omissions.

62. Given Defendant's failure to disclose this non-public information, over which Defendant had exclusive control, about the nature of the Infant Sound Machines and attendant Hearing Loss Risk—and because Plaintiff and the Class could not reasonably have known the true nature of the Infant Sound Machines, or the Hearing Loss Risk presented—Plaintiff and the Class reasonably relied on Defendant's marketing of the Infant Sound Machines and material omissions. Had Plaintiff and the Class known that the Infant Sound Machines pose the Hearing Loss Risk to the public and the scientific, medical, industry and regulatory communities concern for the use of the Infant Sound Machines, they would not have purchased the Infant Sound Machines or would have paid significantly less for them.

63. Plaintiff and the Class have been kept ignorant by Defendant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff and the Class could not reasonably have discovered the true nature of the Infant Sound Machines, the Hearing Loss Risk they present, or the scientific, medical, industry and regulatory communities' concern for the use of the Infant Sound Machines.

**III. Estoppel**

64. Defendant was, and is, under a continuing duty to disclose to Plaintiff and the Class the true character, quality and nature of the Infant Sound Machines. Defendant knowingly, affirmatively and actively concealed the true character, quality and nature of the Infant Sound Machines, and the concealment is on-going. Defendant knew of the serious material risks the Infant

Sound Machines posed to consumers and has actively concealed them. Plaintiff and the Class reasonably relied on Defendant's marketing of the Infant Sound Machines and material omissions. For these reasons, Defendant is estopped from relying on any statute of limitations in defense of this action.

65. Additionally, Defendant is estopped from raising any defense of laches due to its own conduct as alleged herein.

**CLASS ALLEGATIONS**

66. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of herself and the Members of the following proposed nationwide class ("Nationwide Class"):

> During the fullest period allowed by law, all persons who purchased the Infant Sound Machines in the United States for personal use and not for resale.

67. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of herself and the Members of the following proposed multi-state class ("Multi-State Consumer Protection Class"):

> During the fullest period allowed by law, all persons who purchased the Infant Sound Machines in California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey and Washington[50] for personal use and not for resale.

68. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), on behalf of herself and the Members of the following California class ("California Class"):

> During the fullest period allowed by law, all persons who purchased the Infant Sound Machines in the State of California for personal use and not for resale.

---

[50] Plaintiff seeks to certify a Multi-State Consumer Protection Class consisting of persons in the following states (and implicating the following statutes): California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Illinois (815 ILCS §§ 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*).

69. The Nationwide Class, Multi-State Consumer Protection Class, and the California Class, are referred to collectively as the "Class" or "Classes," and the Members of the Classes are referred to as the "Class Members." Excluded from the Classes are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, current or former employees and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

70. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether class certification is appropriate.

71. **Numerosity**: Members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. The precise number of Class Members is unknown to Plaintiff but is likely to be ascertained by Defendant's records. At a minimum, there likely are at least thousands of Class Members.

72. **Commonality**: There are questions of law and fact common to the proposed class(es). Common questions of law and fact include, without limitation:

a. Whether Defendant's course of conduct alleged herein violates the statutory and common law claims pled in this Class Action Complaint;

b. Whether Defendant knew or should have known its marketing of the Infant Sound Machines, and the material omissions were false and misleading;

c. Whether Defendant omitted or failed to disclose material information to Plaintiff and Class Members regarding the Infant Sound Machines;

d. Whether Defendant engaged in false, deceptive or misleading conduct in the marketing, advertising, labeling and sale of the Infant Sound Machines;

e. Whether Defendant was unjustly enriched by retaining monies from the sale of the Infant Sound Machines;

f. Whether certification of each Class is appropriate under Rule 23;

g. Whether Plaintiff and Class Members have been injured by Defendant's misconduct, and the proper measure of their losses as a result of those

injuries;

h. Whether Plaintiff and Class Members are entitled to damages, including compensatory, exemplary and statutory damages, and the amount and nature of such damages; and

i. Whether Plaintiff and the Members of each Class are entitled to declaratory, equitable or injunctive relief, and/or other relief, and the scope of such relief.

73. **Typicality**: Plaintiff's claims are typical of the other Class Members because Plaintiff, as well as Class Members, purchased the Infant Sound Machines and relied on the Defendant's marketing of the Infant Sound Machines, other misrepresentations, the material omissions, and other omissions made by Defendant about the Infant Sound Machines prior to and at the time of the purchases of the Infant Sound Machines. Plaintiff and the Members of each Class paid for Defendant's Infant Sound Machines and would not have purchased them (or would have paid substantially less for them) had they known that Defendant's representations were untrue or deceptive, had they been made aware of the Hearing Loss Risk presented through the normal and directed use of the Infant Sound Machines, or had they been made aware of the recommendations of the scientific, medical, industry and regulatory communities as to the use of Infant Sound Machines.

74. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the proposed Classes as her interests do not conflict with the interests of the Members of the proposed Classes she seeks to represent, and she has retained counsel competent and experienced in class action litigation. Thus, the interests of the Members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

75. **Predominance**: Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Class Action Complaint predominate over any individual ones. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's misconduct detailed at length in this Class Action Complaint.

76. **Superiority**: A class action is superior to all other available methods for the fair and

efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Class Action Complaint. Further, because the damages suffered by any individual Class Member may be relatively modest in relation to the cost of litigation, the expense, and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class Members may be unaware that claims exist against Defendant.

77. **Declaratory and Injunctive Relief**: Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. Defendant has acted, or refused to act, on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole. Unless a class-wide injunction is issued, Defendant will continue to advertise, market, promote and sell the Infant Sound Machines in an unlawful and misleading manner, as described throughout this Class Action Complaint, and Members of the Classes will continue to be misled, harmed and denied their rights under the law. Plaintiff and the Classes do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful misrepresentations and omissions. Additionally, Plaintiff seeks restitution if monetary damages are not available. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and the Classes.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the California Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*

78. Plaintiff brings this count on behalf of herself and the Nationwide Class, Multi-State Consumer Protection Class, and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

79. The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq*.

80. The CLRA applies to all claims of all Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

81. Plaintiff and the Class Members are "consumers" as defined by Civil Code § 1761(d).

82. Defendant is a "person" as defined by Civil Code § 1761(c).

83. The Infant Sound Machines qualify as "goods" as defined by Civil Code § 1761(a).

84. Plaintiff and the Class Members' purchases of the Infant Sound Machines are "transactions" as defined by Civil Code § 1761(e).

85. As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

(a) "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

(b) "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

(c) "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

(d) "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

86. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Infant Sound Machines had benefits or characteristics that they did not actually have.

87. As detailed in the body of this Class Action Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding the Infant Sound Machines benefits or characteristics that they did not in fact have and represented the Infant Sound Machines to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiff and Class Members.

88. The Infant Sound Machines are not safe, are designed to be used in a manner that exposes children to the Hearing Loss Risk and are of an inferior quality and trustworthiness

compared to other infant sound machines in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that the Infant Sound Machines meet a certain standard or quality.

89. As detailed above, Defendant violated the CLRA when it advertised the Infant Sound Machines with the intent not to sell Infant Sound Machines as advertised and knew that the Infant Sound Machines were not as represented.

90. Specifically, Defendant marketed and represented the Infant Sound Machines as safe for children's use, when in fact no reasonable consumer would believe the Infant Sound Machines to be safe if they knew that using the Infant Sound Machines as designed, advertised, and directed exposed their children to the Hearing Loss Risk.

91. Defendant's deceptive practices were specifically designed to induce Plaintiff and Class Members to purchase or otherwise acquire the Infant Sound Machines.

92. Defendant engaged in uniform marketing efforts to reach Class Members, their agents and/or third parties upon whom they relied, to persuade them to purchase and use the Infant Sound Machines manufactured by Defendant. Defendant's packaging, advertising, marketing, website, and retailer product identification and specifications contain numerous false and misleading statements regarding the Infant Sound Machines.

93. Despite Defendant's knowledge that using the Infant Sound Machines as designed, advertised and directed exposed children to the Hearing Loss Risk, Defendant also omitted and concealed information and material facts from Plaintiff and Class Members.

94. In their purchase of Infant Sound Machines, Plaintiff and Class Members relied on Defendant's representations and omissions of material facts, including that usage of the Infant Sound Machines as designed, advertised, and directed exposed children to the Hearing Loss Risk.

95. These business practices are misleading and/or likely to mislead consumers and should be enjoined.

96. Pursuant to Cal. Civ. Code § 1782, Plaintiff notified Defendant in writing by certified mail sent on March 20, 2025, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above and give notice to all affected

consumers of Defendant's intent to do so. Defendant failed to take corrective action within 30 days of the date of written notice. Accordingly, Plaintiff seeks actual, punitive, and statutory damages.

97. A declaration establishing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(d) was contemporaneously filed with the Class Action Complaint. *See* ECF No. 1-001.

98. In accordance with Civil Code § 1780(a), Plaintiff and the other Class Members seek actual, punitive and statutory damages, in addition to injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

**COUNT TWO**
**Violations of the California Unfair Competition Law**
**("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***

99. Plaintiff brings this count on behalf of herself and the Nationwide Class, Multi-State Consumer Protection Class, and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

100. Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

101. Plaintiff and Class Members who purchased Defendant's Infant Sound Machines suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted the Infant Sound Machines' true quality, reliability, design and use. Had Plaintiff and Class Members known that Defendant materially misrepresented the Infant Sound Machines and/or omitted material information regarding its Infant Sound Machines, they would not have purchased the Infant Sound Machines.

102. Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this Class Action Complaint.

103. There is no benefit to consumers or competition by allowing Defendant to deceptively label, market and advertise its Infant Sound Machines.

104. Plaintiff and Class Members who purchased Defendant's Infant Sound Machines had no way of reasonably knowing that the Infant Sound Machines were deceptively packaged, marketed, advertised and labeled, and were unsuitable for their intended use. Thus, Plaintiff and Class Members could not have reasonably avoided the harm they suffered.

105. Specifically, Defendant marketed, labeled and represented the Infant Sound Machines as safe for children's use, when in fact no reasonable consumer would believe the Infant Sound Machines to be safe if they knew that using the Infant Sound Machines as designed, advertised, and directed exposed their children to the Hearing Loss Risk.

106. The gravity of the harm suffered by Plaintiff and Class Members who purchased Defendant's Infant Sound Machines outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and labeling the Infant Sound Machines in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and Class Members.

107. The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff and Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Infant Sound Machines, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

108. Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law. Defendant's false and misleading advertising of the Infant Sound Machines was and continues to be "unlawful" because it violates the CLRA, the FAL, and other applicable laws as described herein. As a result of Defendant's unlawful business acts and practices, Hatch has unlawfully obtained money from Plaintiff and Class Members.

109. Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims. Defendant's conduct was and continues to be of no benefit to purchasers of the Infant Sound Machines, as it is misleading, unfair, unlawful and is injurious to consumers who rely on the labeling and advertising. Deceiving consumers into believing they will receive an Infant Sound Machine that does not pose the Hearing Loss Risk, and that meets all scientific, medical and industry guidelines and regulatory standards, is of no benefit to consumers.

Therefore, Defendant's conduct was and continues to be "unfair." As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from the Plaintiff and Class Members.

110. Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public. Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Infant Sound Machines do not pose the Hearing Loss Risk and meet all scientific, medical and industry guidelines and regulatory standards, when the opposite is true. Because Defendant's conduct has misled or was likely to mislead Plaintiff and Class Members, Defendant's conduct was "fraudulent." As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and Class Members.

111. Plaintiff and the Class do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful sale of the Infant Sound Machines, as well as their misrepresentation or omissions. Damages will only address past injuries visited on Plaintiff and the Class. Defendant continues to market the Infant Sound Machines in a deceptive and misleading manner. Only injunctive relief can prevent any future harm.

112. Additionally, Plaintiff seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez*, 23 Cal.4th at 177 (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez*, 589 F. App'x at 827 (same); *Caro*, 18 Cal. App. 4th at 661 ("In a suit arising under Business and Professions Code section 17200 *et seq*., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

113. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and the Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g.*, *Fladeboe*, 150 Cal. App.

4th at 68 (noting that restitution is available even in situations where damages may not be available).

114. Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Defendant's unfair, unlawful and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

**COUNT THREE**
**Violation of the California False Advertising Law ("FAL")**
**California Business and Professions Code §§ 17500, *et seq.***

115. Plaintiff brings this count on behalf of herself and the Nationwide Class, Multi-State Consumer Protection Class, and the California Class and repeats and re-alleges all previous paragraphs as if fully included herein.

116. The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

117. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

118. Specifically, Defendant marketed, labeled and represented the Infant Sound Machines as safe for children's use, when in fact no reasonable consumer would believe the Infant Sound Machines to be safe if they knew that using the Infant Sound Machines as designed, advertised, and directed exposed their children to the Hearing Loss Risk.

119. At the time of its misrepresentations, Defendant was either aware that the Infant Sound Machines posed the Hearing Loss Risk, which no reasonable consumer would expect would exist through the normal usage of the Infant Sound Machine or was aware that it lacked the information and/or knowledge required to market the Infant Sound Machines as such. Defendant concealed, omitted and failed to disclose this information to Plaintiff and Class Members.

120. Defendant's marketing of the Infant Sound Machines as safe and not disclosing the Hearing Loss Risk was false, misleading and likely to deceive Plaintiff and other reasonable

consumers.

121. Defendant's conduct therefore constitutes deceptive or misleading advertising.

122. Plaintiff has standing to pursue claims under the FAL as she reviewed and relied on Defendant's packaging, labeling, advertising, representations and marketing materials regarding the Infant Sound Machines when selecting and purchasing the Infant Sound Machines.

123. In reliance on the statements made in Defendant's packaging, labeling, advertising, representations, and marketing materials and Defendant's omissions and concealment of material facts regarding the quality, nature and use of the Infant Sound Machines, Plaintiff and Class Members purchased the Infant Sound Machines.

124. Had Defendant disclosed the true nature of the Infant Sound Machines (that they present the Hearing Loss Risk), Plaintiff and Class Members would not have purchased Infant Sound Machines or would have paid substantially less for them.

125. As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including, but not limited to, money from Plaintiff and Class Members who paid for the Infant Sound Machines, which presented the Hearing Loss Risk.

126. Plaintiff and the Class do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful sale of the Infant Sound Machines, as well as their misrepresentation or omissions. Damages will only address past injuries visited on Plaintiff and the Class. Defendant continues to market the Infant Sound Machines in a deceptive and misleading manner. Only injunctive relief can prevent any future harm.

127. Additionally, Plaintiff seeks restitution if monetary damages are not available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez*, 23 Cal.4th at 177 (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez*, 589 F. App'x at 827 (same); *Caro*, 18 Cal. App. 4th at 661 ("In a suit arising under Business and Professions Code section 17200 *et seq*., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

128. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and the Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe*, 150 Cal. App. 4th at 68 (noting that restitution is available even in situations where damages may not be available).

129. Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Defendant's fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

**COUNT FOUR**
**Breach of Contract**

130. Plaintiff brings this count on behalf of herself and on behalf of the Nationwide Class, and the California Class, and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

131. Plaintiff and Class Members entered into contracts with Hatch when they placed orders to purchase the Infant Sound Machine on Hatch's website, or otherwise purchased the Infant Sound Machines through retail stores. A valid contract existed between Plaintiff and the Class Members, on one hand, and Hatch, on the other.

132. The contracts provided that Plaintiff and Class Members would pay Hatch for the Infant Sound Machines ordered.

133. In return, Hatch would provide Plaintiff and Class Members with Infant Sound Machines that were devoid of material omissions. These were specific and material terms of the contracts.

134. Plaintiff and Class Members paid Hatch for the Infant Sound Machines they ordered and satisfied all other conditions of their contracts.

135. Hatch breached the contracts with Plaintiff and the Class Members by failing to disclose the Hearing Loss Risk associated with the Infant Sound Machines.

136. As a direct and proximate result of Hatch's breaches, Plaintiff and Class Members

were deprived of the benefit of their bargained-for exchanges and have suffered damages in an amount to be established at trial.

137. On March 20, 2025, Plaintiff sent Hatch notice of its breach of contract and violations of law as a result of its material omissions.

**COUNT FIVE**
**Breach of Implied Contract**

138. Plaintiff brings this count on behalf of herself and on behalf of the Nationwide Class and the California Class and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

139. Plaintiff and Class Members entered into implied contracts with Hatch when they placed orders to purchase the Infant Sound Machine on Hatch's website, or otherwise purchased the Infant Sound Machines through retail stores.

140. Pursuant to these implied contracts, Plaintiff and Class Members paid money to Defendant. In exchange, Defendant agreed to, among other things, and Plaintiff and Class Members understood that Defendant would: (1) sell them the Infant Sound Machines; (2) the Infant Sound Machine would perform according to Defendant's affirmative representations and omissions; (3) the Infant Sound Machines would not present a Hearing Loss Risk; and (4) the Infant Sound Machines met all scientific, medical and industry guidelines and regulatory standards.

141. The absence of a Hearing Loss Risk to Plaintiff's and Class Members' children was a material term of the implied contracts between Plaintiff and Class Members, on one hand, and Defendant, on the other. Indeed, as set forth supra, Defendant recognized the importance of the health and safety of consumers' children when purchasing and using Infant Sound Machines. Had Plaintiff and Class Members known that Defendant's Infant Sound Machines presented a Hearing Loss Risk and did not meet all scientific, medical and industry guidelines and regulatory standards, they would not have purchased the Infant Sound Machines.

142. Plaintiff and Class Members performed their obligations under the implied contract when they paid Hatch for the Infant Sound Machines.

143. Hatch breached the implied contract with Plaintiff and the Class Members by failing

to disclose the Hearing Loss Risk associated with the Infant Sound Machines.

144. As a direct and proximate result of Hatch's breaches, Plaintiff and Class Members were deprived of the benefit of their bargained-for exchanges and have suffered damages in an amount to be established at trial.

145. On March 20, 2025, Plaintiff sent Hatch notice of its breach of implied contract and violations of law as a result of its material omissions.

**COUNT SIX**
**Breach of Implied Warranties**
**Cal. Com. Code §§ 2314, 2315**

146. Plaintiff brings this count on behalf of herself and on behalf of the Nationwide Class and the California Class and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

**I. Implied Warranty of Merchantability**

147. California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

148. California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any." Id. § 2314(2).

149. Defendant is a merchant with respect to the sale of Infant Sound Machines. Therefore, a warranty of merchantability is implied in every contract for sale of the Infant Sound Machines to California consumers.

150. By advertising the Infant Sound Machines with the material omissions, Defendant made an implied promise that the Infant Sound Machines conform to affirmative representations, do not present a Hearing Loss Risk and met all scientific, medical and industry guidelines and regulatory standards. However, the Infant Sound Machines have not "conformed to the promises . . . made on the container or label" because the Infant Sound Machines do not conform to the affirmative representations, contain the material omissions, present a Hearing Loss Risk and do not meet all scientific, medical and industry guidelines and regulatory standards. Plaintiff, as well as

other California consumers, did not receive the goods as impliedly warranted by Defendant to be merchantable.

151. Therefore, the Infant Sound Machines are not merchantable, and Defendant has breached its implied warranty of merchantability in regard to the Infant Sound Machines.

152. All conditions precedent to Defendant's liability under the above-referenced contract have been performed by Plaintiff and Class Members.

153. If Plaintiff and Class Members had known that the affirmative representations and omission for the Infant Sound Machines were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Defendant's breach, Plaintiff and Members of the Class have suffered injury and deserve to recover all damages afforded under the law.

154. On March 20, 2025, Plaintiff sent Defendant a notice letter notifying it of this breach of warranty.

**II. Implied Warranty of Fitness**

155. California Commercial Code § 2315 states that where a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

156. Plaintiff and Class Members purchased the Infant Sound Machines for the purpose of using them as auditory devices for their children to sleep.

157. Defendant knew, or had reason to know, that Plaintiff and Class Members were purchasing the Infant Sound Machines for this particular purpose. Defendant directs consumers to use the Infant Sound Machines in a manner that presents a Hearing Loss Risk to Plaintiff's and Class Members' children. Defendant is aware that consumers purchase the Infant Sound Machines for such use.

158. Defendant markets itself as a knowledgeable and effective developer and purveyor of Infant Sound Machines.

159. Defendant knew, or had reason to know, that Plaintiff and Class Members would

justifiably rely on Defendant's particular skill and knowledge of Infant Sound Machines in selecting or purchasing products suitable for use as auditory devices for their children to sleep.

160. Plaintiff and Class Members did justifiably rely on Defendant's judgment and skill.

161. The Infant Sound Machines were not suitable for their intended purpose. The Infant Sound Machines present a Hearing Loss Risk and do not meet scientific, medical and industry guidance and regulatory standards.

162. Thus, Defendant breached its implied warranty of fitness concerning the Infant Sound Machines.

163. Plaintiff provided Defendant with notice of this breach, by mailing a notice letter to Defendant, on March 20, 2025.

164. Plaintiff and the Class were foreseeable third-party beneficiaries of Defendant's sale of the Infant Sound Machines. Defendant sells Infant Sound Machines to retailers for distribution and sale to consumers such as Plaintiff and Class Members.

165. Defendant's breach directly caused Plaintiff and Class Members harm. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased Defendant's Infant Sound Machines if they had known the truth, (b) they overpaid for the Infant Sound Machines because the Infant Sound Machines are sold at a price premium due to the misrepresentations and omissions, and/or (c) they received a product that was defective and thus worthless for its intended purpose.

**COUNT SEVEN**
**Breach of Express Warranty**
**Cal. Com. Code § 2313**

166. Plaintiff brings this count on behalf of herself and on behalf of the Nationwide Class and the California Class and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

167. California's express warranty statutes provide that "(a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) [a]ny description of the goods which is made part of the basis of the bargain creates an

express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

168. Plaintiff and Class Members formed a contract with Defendant at the time they purchased the Infant Sound Machines. As part of those contracts, Defendant promised that the Infant Sound Machines conformed to its affirmative representations and were devoid of the material omissions and Hearing Loss Risk.

169. These representations and omissions are affirmations of fact or promises that constitute an express warranty and became part of the basis of the bargain between Plaintiff and Class Members on the one hand, and Defendant, on the other.

170. Defendant made its affirmative representations and material omissions to induce Plaintiff and Members of the Class to purchase the Infant Sound Machines, and Plaintiff and Class Members reasonably and justifiably relied on the affirmative representations and material omissions in purchasing the Infant Sound Machines, believing that the Infant Sound Machines did in fact conform to those warranties, did not present a Hearing Loss Risk, and met all scientific, medical and industry guidelines and regulatory standards.

171. All conditions precedent to Defendant's liability under the above-referenced contract have been performed by Plaintiff and Class Members.

172. Defendant has breached the express warranties about the Infant Sound Machines because, as alleged above, the Infant Sound Machines do not conform to the affirmative representations, include material omissions, present a Hearing Loss Risk, and do not meet all scientific, medical and industry guidelines and regulatory standards. Thus, as alleged herein, these express representations and omissions are false and misleading.

173. Plaintiff and Class Members paid a premium price for the Infant Sound Machines, but did not obtain the full value of the Infant Sound Machines as represented. If Plaintiff and Class Members had known of the true nature of the Infant Sound Machines, they would not have been willing to pay the premium price associated with them. As a result, Plaintiff and Class Members suffered injury and deserve to recover all damages afforded under the law.

174. On March 20, 2025, Plaintiff sent Defendant a notice letter notifying it of its breach of warranty.

**COUNT EIGHT**
**Violation of the Song-Beverly Consumer Warranty Act,**
**California Civil Code §§ 1792 and 1791.1, *et seq*.**

175. Plaintiff brings this count on behalf of herself and the California Class, and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

176. Plaintiff's Infant Sound Machine and all Infant Sound Machines sold by Defendant are "consumer goods" within the meaning of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1791(a).

177. Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Infant Sound Machines, and knew or had reason to know of the specific use for which the Infant Sound Machines were purchased.

178. Defendant provided Plaintiff and the Class with express and implied warranties that the Infant Sound Machines were merchantable and fit for the ordinary and particular purposes for which they were sold.

179. Defendant breached these warranties because the Infant Sound Machines present a Hearing Loss Risk that makes them unsafe for their intended use with infants.

180. Plaintiff and the Class are among those intended to be ultimate consumers of the Infant Sound Machines.

181. At all times Defendant warranted and sold the Infant Sound Machines, it knew or had reason to know that Plaintiff and the Class were purchasing the Infant Sound Machines for the particular purpose of using the Infant Sound Machines as safe auditory devices for their children to sleep.

182. The Infant Sound Machines were defective when Defendant delivered them to its resellers, dealers, and distributors which sold the Infant Sound Machines, and were still defective when they reached Plaintiff and the Class.

183. Defendant's resellers, dealers, and distributors are intermediaries between Defendant and consumers and are not themselves consumers of the Infant Sound Machine.

184. Defendant's warranties were designed to influence consumers who purchased and/or owned the Infant Sound Machines.

185. Plaintiff and each Class member's acquisition of the Infant Sound Machines suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendant on the other hand; however privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Defendant and its resellers, authorized dealers, and, specifically, of Defendant's warranties.

186. As a result of Defendant's breach of the applicable implied warranties, purchasers of the Infant Sound Machines suffered an ascertainable loss of money, property, and/or value of their products.

187. As a direct and proximate result of Defendant's breach, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, injunctive relief, attorneys' fees and costs.

188. On March 20, 2025, Plaintiff sent Defendant a notice letter notifying it of its breach of warranties and of California consumer protection laws.

**COUNT NINE**
**Negligent Misrepresentations/Omission**

189. Plaintiff brings this count on behalf of herself and on behalf of the Nationwide Class and the California Class, and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

190. As alleged more fully above, Defendant made false and misleading representations to Plaintiff and Class Members when it marketed the Infant Sound Machines as a safe auditory device for children's sleep and with the material omissions.

191. When Defendant made these affirmative representations and omissions, it knew or reasonably should have known that they were false and misleading. Defendant had no reasonable grounds for believing that these affirmative representations and omissions were true when made.

192. Defendant intended that Plaintiff and Class Members rely on these affirmative representations and omissions. Plaintiff and Class Members reasonably relied on the affirmative representations and omissions in purchasing the Infant Sound Machines.

193. Defendant's affirmative representations and omissions were a substantial factor and proximate cause of the damages and losses to Plaintiff and Class Members.

194. In addition, class-wide reliance can be inferred because Defendant's affirmative representations and omissions were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to buy the Infant Sound Machines.

195. Defendant also made material omissions in selling the Infant Sound Machines. Specifically, Defendant concealed information related to whether the Infant Sound Machines presented a Hearing Loss Risk, and whether the Infant Sound Machines met all scientific, medical and industry guidelines and regulatory standards. Moreover, Defendant concealed information related to the scientific, medical, industry and regulatory communities' concerns with the Infant Sound Machines.

196. In deciding to purchase the Infant Sound Machines from Defendant, Plaintiff and Class Members reasonably relied on Defendant's material omissions to form the mistaken belief that the Infant Sound Machines did not present a Hearing Loss Risk and met all scientific, medical and industry guidelines and regulatory standards.

197. Defendant had a duty to disclose the material omissions because it had superior knowledge and access to material facts about the Infant Sound Machines, and a reasonable consumer could not have reasonably expected or known that the Infant Sound Machines presented a Hearing Loss Risk or failed to meet all scientific, medical and industry guidelines and regulatory standards.

198. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because Plaintiff and Class Members would not have purchased the Infant Sound Machines, or would have paid significantly less for them, if they knew the Infant Sound Machines carried a Hearing Loss Risk and did not meet regulatory and industry standards.

**COUNT TEN**
**Unjust Enrichment/Quasi-Contract**
**(In the Alternative)**

199. Plaintiff brings this count on behalf of herself and on behalf of the Nationwide Class, and the California Class, and hereby repeats and re-alleges all previous paragraphs as if fully included herein.

200. Defendant's unfair and unlawful conduct includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Class Action

Complaint. Defendant's acts and business practices offend the established public policy of the states, including California, as there is no societal benefit from false advertising, only harm. While Plaintiff and Class Members were harmed at the time of purchase, Defendant was unjustly enriched by its misrepresentations and omissions.

201. Plaintiff and Class Members were harmed when purchasing Defendant's Infant Sound Machines as a result of Defendant's material representations and omissions, as described in this Class Action Complaint. Plaintiff and each Class Member purchased Defendant's Infant Sound Machines. Plaintiff and Class Members have suffered injury in fact and lost money as a result of paying the price they paid for the Infant Sound Machines as a result of Defendant's unlawful, unfair and fraudulent business practices.

202. Defendant's conduct allows Defendant to knowingly realize substantial revenues from selling its Infant Sound Machines at the expense of, and to the detriment of, Plaintiff and Class Members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental principles of justice, equity and good conscience.

203. Plaintiff and Class Members confer significant financial benefits and pay substantial compensation to Defendant for its Infant Sound Machines, which are not as Defendant represents them to be.

204. Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class Members' overpayments.

205. Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Name Plaintiff as Class Representative and Plaintiff's attorneys as Class Counsel;

c. Award damages, including compensatory, exemplary and statutory damages to Plaintiff and the Classes in an amount to be determined at trial;

d. Grant restitution to Plaintiff and the Classes and require Defendant to disgorge its ill-gotten gains;

e. Enter an Order enjoining Defendant from engaging in the wrongful and unlawful conduct alleged herein and requiring Defendant to issue corrective actions including notification, recall, and fully-covered replacement parts and labor or replacement Infant Sound Machines;

f. Award Plaintiff and the Classes their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

g. Award Plaintiff and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

h. Award such further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

DATE: October 30, 2026 */s/ Thomas Wheeler*

Thomas Wheeler (SBN 308789)
**TOM WHEELER LAW**
213 North Glendale Ave. #1188
Glendale, CA 91206
T: (213) 342-4243
tom@twheelerlaw.com

Zachary Arbitman**
George Donnelly**
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com
*Attorneys for Plaintiff and the Putative Classes*

**Pro Hac Vice Forthcoming*